IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>EDWIN EDGARDO DIAZ,<br><br>　　　　Defendant. | Case No. 23-CR-4012-LTS-KEM<br><br>**REPORT AND RECOMMENDATION** |

Defendant Edwin Edgardo Diaz is charged with two counts of possession with the intent to distribute a controlled substance and one count of unlawful possession of a firearm and ammunition. Doc. 3. Diaz moves to suppress evidence seized during searches of his vehicle and residence. Doc. 28. The Government resists. Doc. 41. I held an evidentiary hearing on August 2, 2023, at which Ida County Sheriff's Deputy Jared Clausen and Sac County Sheriff's Deputy Kathryn Stange testified. I admitted the following exhibits without objection:

- **Exhibit 1:** Search warrant documents (Doc. 42);
- **Exhibit 2:** Search warrant return (Doc. 41-2);
- **Exhibit 3:** Report – Deputy Stange (Doc. 41-3);
- **Exhibit 4:** Video – Deputy Clausen patrol vehicle (Doc. 43);
- **Exhibit 5:** Video – Deputy Clausen body camera (Doc. 43); and
- **Exhibit 6:** Report – Deputy Clausen (Doc. 41-6).

I admitted the following exhibit after denying Diaz's relevance objection:

- **Exhibit 7:** Sac County court documents (Doc. 48-1).

This document was admitted for the limited purpose of providing context to the events leading up to the January 4, 2023 search; it will not be considered as after-the-fact support or corroboration for the search warrant or actions taken by law enforcement.

At the conclusion of the evidentiary hearing, I granted Diaz's unopposed request to supplement his motion to further challenge the search warrant under *Franks v. Delaware*.[1] Diaz filed a supplemental motion (Doc. 56), and the Government filed supplemental resistances (Docs. 51, 59). I recommend **denying** Diaz's motion to suppress.

## I. FACTS AND BACKGROUND[2]

### A. *Pickup encounter – December 31, 2022*

Just after midnight on December 31, 2022, while on routine patrol, Deputy Clausen saw a pickup parked on the side of a street in Ida Grove, Iowa. Deputy Clausen was driving on a parallel street to the pickup, and video from his patrol vehicle (Exhibit 4) shows him driving and then slow as he approaches the parallel street before he ends up turning onto that street. He approached the pickup head on. The pickup's front end was next to the snowy curb and the back end was sticking out farther from the curb. The front passenger light was on while the driver's light was dark. Deputy Clausen noticed a male and a female in the pickup as he drove by. He turned around, pulled in behind the pickup, and activated his patrol vehicle's flashing lights. The pickup's rear lights were broken out (one appeared to be dangling). Deputy Clausen testified that he stopped to check on the welfare of the people inside the pickup due to the weather (below zero temperatures with snow on the ground) and because the pickup was impeding the lane of

---

[1] 438 U.S. 154 (1978).

[2] The facts in this section are taken from the testimony at the suppression hearing and the exhibits admitted into evidence.

travel. Deputy Clausen testified that he smelled the odor of marijuana coming from the pickup as he approached.

Deputy Clausen asked the occupants what they were doing and the driver (Diaz) said they were sitting there. Deputy Clausen asked if they had wrecked or what had happened, and Diaz responded no, that they had just gotten the pickup from the impound that day. Deputy Clausen asked Diaz to show him his identification and said "hi Mikala" to the passenger (he recognized her as Mikala Breen based on prior interactions with her). Diaz asked Deputy Clausen why he was asking for his identification as he handed him his driver's license. Deputy Clausen responded that he stopped because they were parked in a residential area and he wanted to make sure they were okay, and that he could now smell "weed." Diaz said, "no, you can't—there's no weed in here," and that they were parked because apartments were nearby. Deputy Clausen said the pickup was parked but that the lights were on, to which Diaz disagreed, saying the lights didn't work. Deputy Clausen explained that when he drove by the lights were on, and he walked to the front of the pickup—the light on the passenger's side was no longer on. Diaz continued to explain that the pickup had just been released from impound and that it had been wrecked a while back. This appeared to be consistent with the rear lights and front driver's light being broken out.

Deputy Clausen asked if the pickup stopped running because it was parked "kinked," and Diaz responded that it had not been driven and had been towed to that location that day from impound. Deputy Clausen testified he found this unlikely because towing companies generally do not leave vehicles like that due to liability concerns. He also saw tire tracks that showed the pickup had been driven there. Deputy Clausen also testified the pickup was parked near an apartment complex where there are frequent calls for service related to illegal drug activity, though this factor did not impact his decision to stop to check on the safety of the vehicle occupants.

3

The license check showed Diaz had a suspended license and a long history of convictions, including eluding, driving while suspended, and operating while impaired. The check also indicated Diaz had a protective order against him (the protected party was not present). Deputy Clausen asked Diaz to step out of the pickup to talk to him. Diaz responded that the driver's door didn't work, so Deputy Clausen asked him to step out on the passenger's side. Deputy Clausen testified that as he moved from the driver's side to the passenger's side of the pickup, he kept his eyes and flashlight on the occupants of the pickup, and he saw Diaz take something from his left pocket and drop it on the floorboard of the pickup. Deputy Clausen asked him what he just did and what he had "just put down there." Diaz denied dropping anything. Deputy Clausen directed Breen to sit down on the ground "right now." He told Diaz he was being detained. When Diaz asked why, Deputy Clausen said it was because he was "fumbling around in there," which Diaz denied. Deputy Clausen handcuffed Diaz and told him that he would be patted down for weapons. Deputy Clausen also explained that because he smelled "weed," he was going to search both Diaz and Breen's persons, as well as the pickup. Diaz then asked Deputy Clausen, "can I just give it to you?" Deputy Clausen asked what he wanted to give him, and Diaz responded, "the weed." Deputy Clausen asked where it was at, and Diaz pointed to the pickup. After that, Deputy Clausen radioed that he had one person detained and then read Diaz his rights. Diaz said he did not want to talk to Deputy Clausen, and Deputy Clausen responded that was fine.

Deputy Clausen searched Diaz's person and a backpack that appeared to belong to Breen. He indicated a female officer was on the way to search Breen, and he asked her if she had anything in her bra that would get her in trouble "like last time." Around this time, Deputy Clausen coughed and indicated his sinuses had lately been bad. He testified that the cold made his nose run.

4

Deputy Clausen testified that after other officers arrived, he looked through the window of the pickup and saw a baggie with a white crystal substance in the area where he had seen Diaz fumbling as he exited the pickup. Officers seized that bag, as well as suspected marijuana and drug paraphernalia, from inside the pickup.

### B. Search warrant – January 4, 2023

On January 4, 2023, Deputy Stange applied for a search warrant for Diaz's residence in Odebolt, Iowa. Around 5:00 a.m. that morning, an employee at a Casey's store in Early, Iowa, had called law enforcement about a female who came into the store. The employee was concerned because the female (later identified as Breen) appeared to be scared and hiding from someone. Breen reported to the responding deputy that Diaz and his girlfriend had dropped Breen off at the Casey's after Diaz made Breen sign a statement taking responsibility for the items seized during the December 31 pickup search in Ida Grove.

Deputy Stange learned of this information and spoke with Breen the same day. Deputy Stange sought to ensure Breen provided consistent information with her first report and to gather additional information. Breen told Deputy Stange that Breen had gotten a ride from Diaz, who made her ride in the front passenger seat while he sat in back and his girlfriend drove. During the car ride, Diaz asked Breen why she had "snitched" or provided law enforcement with information about a different individual but had not provided information about Diaz. Breen reported that Diaz forced her to sign a document claiming responsibility for the December 31 incident, that he took her phone and said he would not return it until she had done so, and that she believed he recorded her because she saw a cell phone and a flash. According to Breen, Diaz said he would not hurt her but knew others who would. She heard him making a clinking sound from the backseat that she believed were handcuffs. Breen told the responding officer at the scene that the vehicle she had been driven in was a Ford. When questioned later, she

5

pointed to a red Chevrolet Cruz as the type of vehicle that Diaz and his girlfriend used to drive her around. Breen showed Deputy Stange messages on Facebook Messenger that were consistent with Diaz trying to get Breen to take responsibility. Deputy Stange testified that during the interview, Breen appeared afraid and jumpy, fidgeted, said she wanted to leave the apartment, and inquired about a no-contact order against Diaz.

Deputy Stange applied for a state search warrant to search Diaz and his girlfriend's apartment and their vehicle. The affidavit in support of the search warrant application noted that a Casey's employee contacted law enforcement around 5:40 a.m. to report that a woman (later identified as Breen) had been dropped off at the store in a red Chevrolet Cruz and was hiding from someone. The affidavit then set out the following information obtained from speaking with Breen:

- Breen communicated with Diaz through Facebook Messenger about a ride, and they went to someone's apartment in Odebolt, Iowa.
- Diaz and Breen later left the apartment in what Breen described as a red Chevrolet Cruz, driven by a person that Breen identified as Amy, Diaz's girlfriend.
  - Law enforcement confirmed that a red Chevrolet Cruz had been registered to Amy Hartwig and was currently registered to a person believed to be Hartwig's mother. Law enforcement also discovered Facebook information indicating that Diaz was in a relationship with Hartwig.
- Diaz confronted Breen in the car about providing information to law enforcement about a named male who was in custody in the Ida County Jail.
  - Law enforcement confirmed that person was currently an inmate at that jail.
- Diaz asked for Breen's phone and then refused to return it to her during the drive.

6

- Diaz wrote a statement in a notebook and demanded Breen sign it, which had her taking responsibility "for the drugs that Diaz was recently charged with."
- Both Diaz and his girlfriend refused to let Breen out of the car until she signed the statement.
- Breen heard handcuffs clicking in the backseat (where Diaz sat), and Diaz said although he would not hurt Breen, he knew people that could.
- Diaz also took a video of Breen with his phone stating that the drugs belonged to her.
- After Breen signed the statement, Diaz and his girlfriend returned her phone and dropped her off at the Casey's.
- Later that day, Diaz messaged Breen on Facebook Messenger, stating: "Talk to my lawyer today he said u need talk to your lawyer about that before this shot gets started so they don't charge me for a bunch of bullshit extra money."
   - Law enforcement indicated they believed this message referred to "Breen taking responsibility for the drugs that Diaz was charged with."

In addition, the affidavit set out Diaz's criminal history (which included several convictions for possessing unlawful drugs and paraphernalia, most recently in December 2019), as well as five parole violations from February to May 2022 in which Diaz tested positive for methamphetamine. The affidavit also noted that Diaz had recently been charged on December 31 by criminal complaint with various drug offenses after he was found in possession of 50 grams of methamphetamine, which is a distribution quantity. The affidavit then set out information indicating that Diaz and Hartwig lived at the residence to be searched.

The search warrant application included an "Informant's Attachment" for information provided by a named individual or a confidential informant, setting out a checklist of factors for establishing the reliability of the provided information. This attachment was crossed through with "N/A" written across it.

The search warrant application and affidavit omitted information about Breen's criminal history—specifically that she had been charged along with Diaz in the December 31 incident, and that she was a known drug user. Deputy Stange saw Facebook messages between Diaz and Breen but did not include this information in the affidavit. Deputy Stange also omitted from the affidavit that she had been investigating Diaz for drug trafficking for three months, during which surveillance was conducted at the target residence and controlled purchases of drugs were made that implicated Diaz in drug trafficking. Deputy Stange testified that her investigation of Diaz incriminated him and in no way exculpated Diaz.

A state judge issued the requested warrant to search Diaz and Hartwig's residence, their persons, and vehicles associated with them. It authorized the seizure of handcuffs, methamphetamine and related paraphernalia, and computers and cell phones (among other things). Officers executed the warrant on January 4, 2023, searching the residence and the Cruz. Officers seized traditional handcuffs and flexicuffs, a handcuff key, a firearm, ammunition, United States currency, cell phones, scales, drug paraphernalia and residue, suspected drugs, and a spiral notebook.

Diaz argues that Deputy Clausen lacked both reasonable suspicion and probable cause to stop Diaz's pickup on December 31. Diaz also argues that the search warrant is not supported by probable cause and that omissions in the search warrant render it invalid.

## *II. DISCUSSION*

### A. *Pickup encounter – December 31, 2022*

Diaz asserts his pickup was lawfully parked on the side of the road in a residential area when Deputy Clausen pulled in behind the pickup. Thus, Diaz argues that Deputy Clausen lacked lawful grounds to stop the pickup and detain Diaz. Diaz argues the pickup did not block the flow of traffic and was parked similarly to other vehicles.

8

The Government asserts that Deputy Clausen approaching the parked pickup did not necessarily implicate the Fourth Amendment. The Government additionally argues that traffic violations (defective lights and the manner of parking)[3] and the need to check on the safety of the occupants allowed Deputy Clausen to lawfully approach the pickup.

An officer may approach a parked vehicle and speak with the occupants without implicating the Fourth Amendment. "In determining whether an encounter between a police officer and a citizen constitutes a Fourth Amendment detention or seizure, 'the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."'"[4] Relevant factors in this determination include the number of officers present, the officers' demeanor (including the language and tone used), the display of a weapon by an officer, and whether an officer physically touches the individual.[5]

Here, Deputy Clausen stopped to check on the vehicle because it was parked haphazardly, just after midnight on New Year's Eve, in cold weather (below zero temperatures with snow on the ground). The video shows that when Deputy Clausen approached the pickup, the window was already rolled down, and he then spoke with Diaz in a pleasant and conversational manner. The only factor weighing in favor of detention was Deputy Clausen activating his blue and red light bar, commonly used to conduct traffic stops. But as the Eighth Circuit has noted, law enforcement also commonly activate their emergency lights when "approach[ing] a stranded motorist to

---

[3] The Government's brief, however, fails to cite statutes to support these assertions. The court notes Iowa Code Sections 321.384 (When lighted lamps required), 321.385 (Headlamps on motor vehicles), 321.385A (Citation for unlighted headlamp, rear lamp, or rear registration plate light), 321.387 (Rear lamps), and 321.361 (Additional parking regulations).

[4] *Barry*, 394 F.3d at 1074-75 (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)).

[5] *Id.* at 1075.

9

offer assistance."[6] Considering all of the circumstances presented, I do not find the use of the emergency lights converted the encounter into a seizure under the Fourth Amendment.[7]

In addition, Deputy Clausen could lawfully stop the vehicle for potential traffic violations. "Any traffic violation, however minor, provides probable cause for a traffic stop."[8] Deputy Clausen testified that the pickup was parked "cockeyed," blocking the north-south flow of traffic, and that it had only one working head lamp. According to Deputy Clausen, these constituted violations of Iowa's traffic laws. The video shows that the back end of the pickup stuck out farther from the curb than the front of the pickup. Though it did not prevent another vehicle from passing, the pickup was parked across a good part of the right lane and would likely have prevented two vehicles traveling toward each other on that road from driving by at the same time. The pickup's curbside wheels do not appear to be parallel to and within eighteen inches of the curb, as required by law.[9] In addition, the video shows that when Deputy Clausen first drove by the pickup, the head lamp illuminated on the passenger's side but not on the driver's side. Though

---

[6] *United States v. Dockter*, 58 F.3d 1284, 1287 (8th Cir. 1995).

[7] *See United States v. Carpenter*, 462 F.3d 981, 983, 985-86 (8th Cir. 2006) (holding defendant was not seized for purposes of the Fourth Amendment, despite officer pulling behind defendant's car parked on the side of the road and "activating the emergency flashing lights on top of his police car"); *see also United States v. Cook*, 842 F.3d 597, 559-601 (8th Cir. 2016) (finding no Fourth Amendment seizure when officer parked behind vehicle idling in high-crime area at night and activated "wig wag" lights on patrol vehicle (different from the "full light bar"), and driver rolled down window as officers approached without officers ordering him to do so); *Dockter*, 58 F.3d at 1287 (no Fourth Amendment seizure when officer pulled behind vehicle parked on the side of the road, "activated his amber warning lights," and approached vehicle and asked if occupants needed assistance).

[8] *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012) (quoting *United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008)).

[9] *See* **Iowa Code § 321.361(1)**.

the vehicle was not actively being driven at the time, it seems reasonable that it had been or was going to be driven, providing a basis for Deputy Clausen to investigate a potential violation of the head lamp statute.[10] This provided an additional ground for Deputy Clausen to investigate.

Deputy Clausen testified that as he approached the vehicle, he smelled the odor of marijuana, and that the odor grew stronger as he neared the vehicle. This seems logical as the driver's window was down as Deputy Clausen approached the vehicle, and I find his testimony to be credible. The odor of marijuana alone provided probable cause to search the vehicle under the automobile exception to the warrant requirement.[11] The odor of marijuana also provided, at a minimum, reasonable suspicion to detain Diaz and have him exit the pickup. Deputy Clausen then saw Diaz reach into his pocket and drop something on the pickup floorboard as he got out of the pickup, providing additional grounds to further investigate. After Diaz was detained and Deputy Clausen was explaining the vehicle would be searched, Diaz volunteered to show Deputy Clausen where the marijuana was located inside the vehicle.

I find Deputy Clausen lawfully approached the vehicle and that he had probable cause to search the vehicle. I therefore recommend denying Diaz's motion to suppress evidence seized as the result of the search of his vehicle.

### B. Search warrant – January 4, 2023

Diaz challenges the warrant's probable cause finding, particularly the lack of corroboration of Breen's statement and the nexus between the facts in the affidavit and Diaz's residence. In accordance with "[t]he Fourth Amendment's strong preference for searches conducted pursuant to a warrant," "after-the-fact scrutiny by courts of the

---

[10] *See* **Iowa Code §§ 321.384, 321.385**.

[11] *United States v. Williams*, 955 F.3d 734, 737 (8th Cir. 2020); *Barry*, 394 F.3d at 1078.

11

sufficiency of an affidavit should not take the form of *de novo* review"; "the duty of a reviewing court is simply to ensure that the [issuing judge] had a 'substantial basis for . . . conclud[ing]' that probable cause existed."[12] Probable cause exists when, "under the totality of circumstances, there is a fair probability [that] evidence of a crime will be found in a particular place" or that the requested search will "lead to the discovery of evidence."[13] "Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, [the Eighth Circuit] has also recognized that law enforcement officers may make reasonable inferences . . . .'"[14] "[T]o support an application for a search warrant, '[t]here must be evidence of a nexus between the contraband and the place to be searched.' Factors to consider in determining if a nexus exists include 'the nature of the crime and the reasonable, logical likelihood of finding useful evidence.'"[15]

Here, the affidavit sets forth information from Breen establishing that Diaz held Breen in his girlfriend's car against Breen's will and threatened her. "[L]aw enforcement officers are entitled to rely on information supplied by the victim of a crime, absent some indication the information is not reasonably trustworthy or reliable."[16] In addition, the affidavit notes law enforcement corroborated aspects of Breen's story: the gas station clerk confirmed Breen had been dropped off in a red Chevrolet Cruz; registration records

---

[12] ***Illinois v. Gates***, 462 U.S. 213, 236, 238-39 (1983) (last alteration in original) (quoting ***Jones v. United States***, 362 U.S. 257, 271 (1960)); *accord* ***United States v. Buchanan***, 574 F.3d 554, 561 (8th Cir. 2009).

[13] ***United States v. Faulkner***, 826 F.3d 1139, 1144, 1146 (8th Cir. 2016).

[14] ***United States v. Brackett***, 846 F.3d 987, 992 (8th Cir. 2017) (quoting ***United States v. Thompson***, 210 F.3d 855, 860 (8th Cir. 2000)).

[15] ***United States v. Johnson***, 848 F.3d 872, 878 (8th Cir. 2017) (quoting ***United States v. Colbert***, 828 F.3d 718, 726 (8th Cir. 2016)).

[16] ***United States v. Wallace***, 550 F.3d 729, 734 (8th Cir. 2008).

tied the red Chevrolet Cruz to Diaz's girlfriend, who Breen said had been driving; social media showed Diaz and his girlfriend's relationship status; the Sac County Sheriff's office knew that a named individual had previously lived at an apartment complex as described by Breen, and the person Breen said Diaz confronted her about was in fact detained in the Ida County Jail as Breen indicated.[17] "It is well established that even the corroboration of minor, innocent details can suffice to establish probable cause."[18]

Diaz argues that nothing in the affidavit connects drugs or other evidence to his residence. Here, Breen reported that Diaz recorded video of her taking responsibility for the drugs with his cell phone. The Eighth Circuit has held that where a victim reported the defendant recorded a criminal sex act in a prior residence, law enforcement and the issuing judge could "reasonabl[y] . . . infer that [the defendant] would have the video . . . at his new residence."[19] Similarly, here, law enforcement and the issuing judge could reasonably infer that the cell phone or recording (evidence of the crime) could be found at Diaz's residence.

As for drugs, I agree with Diaz that it is questionable whether the affidavit sets out facts establishing probable cause to search Diaz's house for evidence of drug trafficking. The affidavit notes a criminal complaint issued four days prior indicated that

---

[17] The affidavit does not affirmatively state that law enforcement viewed the Facebook messages between Breen and Diaz, although this can perhaps be inferred by the inclusion of the full text of one of the messages, including informal spelling ("u") and typos ("this shot" instead of the curse word).

[18] *United States v. O'Dell*, 766 F.3d 870, 874 (8th Cir. 2014) (cleaned up) (quoting *United States v. Keys,* 721 F.3d 512, 518 (8th Cir. 2013)).

[19] *United States v. Summage*, 481 F.3d 175, 1076, 1078 (8th Cir. 2007); *cf. United States v. Carpenter*, 341 F.3d 666, 671 (8th Cir. 2003) (when discussing good-faith exception, noting that "[a]s a matter of common sense, it is logical to infer that someone in possession of valuable contraband would store that contraband in a safe, accessible location such as his or her residence").

Diaz had been found in possession of 50 grams of methamphetamine, which is a distribution quantity, but it is not clear when this possession occurred (on the date the complaint was filed or at some earlier time). The affidavit does not set forth facts specifically tying drugs to Diaz's residence—the only other information related to drugs is that Diaz tested positive for methamphetamine several times between February and May 2022 and that he wanted Breen to take responsibility for the methamphetamine he was recently charged with possessing. The affidavit notes that Deputy Stange "know[s] that individuals who have possession of illegally possessed controlled substances will typically keep paraphernalia and accessories including pipes, baggies, and scales," but does not specify where such individuals keep this paraphernalia, nor otherwise set out other "belief" statements related to residences.

The Eighth Circuit has suggested other circuits have adopted "a per se rule to the effect that probable cause to arrest a drug trafficker establishes an inference that records, paraphernalia, and other evidence of drug trafficking exists at the trafficker's residence."[20] It has noted, however, that "without a nexus between a defendant's drug-dealing and the defendant's residence, evidence of the former does not provide probable cause for a warrant to search the latter."[21] But the court has held this nexus may be established through a defendant's "continuous course of drug trafficking" and a "belief statement" that evidence of drug trafficking can be found at drug traffickers' residences;[22] or even simply through a belief statement (after finding the defendant in possession of items used to manufacture drugs a single time).[23]

---

[20] *United States v. Ross*, 487 F.3d 1120, 1123 (8th Cir. 2007).

[21] *United States v. Norey*, 31 F.4th 631, 637 (8th Cir. 2022).

[22] See *United States v. Luloff*, 15 F.3d 763, 768 (8th Cir. 1994).

[23] See *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009).

14

I would argue that the issuing judge could reasonably infer that "drug manufactures often keep contraband and proceeds at their personal residences," even without the affidavit including a belief statement to that effect.[24] But even if the affidavit failed to establish probable cause, the good-faith exception would apply. When it is later determined that a warrant is not supported by probable cause, evidence obtained from that warrant need not be excluded if officers reasonably relied in good faith on the judge's issuance of the warrant.[25] Reliance on a warrant is unreasonable when probable cause is so lacking "as to render official belief in its existence entirely unreasonable."[26]

The Eighth Circuit has repeatedly held that "the good-faith exception [applies] in controlled-substance cases even when an affidavit did not establish a nexus between the search location and the suspected contraband"; reliance on the warrant is not unreasonable, the court has reasoned, because officers can "logically infer that a drug dealer would store contraband at his residence."[27] In addition, here, Deputy Stange had been investigating Diaz for three months and knew that Diaz had been implicated in controlled purchases or attempted controlled purchases of drugs. The court "may consider 'what the officers knew but did not include in the affidavit' to decide whether their reliance on the warrant was objectively reasonable."[28] Here, Deputy Stange had evidence tying Diaz to drug trafficking; she just failed to include this information in the affidavit. Also, Deputy Stange testified that Breen actually showed her Facebook

---

[24] *Cf. **id.***

[25] ***Carpenter***, 341 F.3d at 669 (discussing the good-faith exception outlined in *United States v. Leon*, 468 U.S. 897 (1984)).

[26] ***Id.*** at 670.

[27] *United States v. Mayweather*, 993 F.3d 1035, 1041 (8th Cir. 2021).

[28] *United States v. Dickerman*, 954 F.3d 1060, 1067 (8th Cir. 2020) (cleaned up) (quoting ***United States v. Farlee***, 757 F.3d 810, 819 (8th Cir. 2014)).

messages consistent with those discussed in the affidavit; she did not specifically state that in the affidavit.

Law enforcement officers reasonably relied on the warrant's probable-cause determination in searching Diaz's residence. Accordingly, I recommend denying Diaz's motion to suppress evidence obtained as a result of the search of his residence pursuant to the search warrant.

### C. Franks Challenge

Diaz challenges two omissions from the warrant affidavit. When a judge issues a search warrant based on "on an affidavit containing false or omitted statements, the resulting search warrant may be invalid."[29] To invalidate the warrant, the defendant must show, by a preponderance of evidence, (1) that the affiant acted intentionally or with reckless disregard in making the false statement or material omissions, and (2) that the affidavit would not support a finding of probable cause if the false statements were left out of, or the material omissions were included in, the affidavit.[30] This standard comes from the Supreme Court's decision in *Franks v. Delaware*.

To be entitled to a *Franks* hearing, "a defendant must make a substantial preliminary showing that includes 'allegations of deliberate falsehood or of reckless disregard for the truth.'"[31] "This substantiality requirement is not met lightly and requires a defendant to offer specific allegations along with supporting affidavits or similarly reliable statements."[32] This requirement is based on "a presumption of validity

---

[29] *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007).

[30] *Id.*

[31] *Id.* (quoting *Franks*, 438 U.S. at 171).

[32] *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015).

16

with respect to the affidavit supporting the search warrant."[33] "Because a warrant application need only show facts establishing probable cause, reckless disregard for the truth may be inferred from the omission of information from an affidavit only when the material omitted would have been clearly critical to the finding of probable cause."[34] Put another way, the defendant must show that probable cause would not have existed if the false information had been omitted from the affidavit, or if the omitted information had been included in the affidavit.[35] If the affidavit would still provide probable cause to issue a search warrant, the defendant fails to make the necessary preliminary showing for a *Franks* hearing.[36]

Here, Diaz argues that the warrant affidavit failed to include that Breen was a codefendant in the pending state court drug case against Diaz and that Breen was a known drug user. But including this information in the affidavit would not have negated a finding of probable cause—as noted in the preceding section, Breen gave law enforcement information as the victim of a crime, and officers independently corroborated some aspects of her story. Also, including information that Breen had also been charged with drug possession further corroborates her account as a victim (it seems more plausible she could take responsibility for the drugs if she was also charged in the incident). Accordingly, I recommend finding no *Franks* violation occurred.[37]

---

[33] *Williams*, 477 F.3d at 558.

[34] *United States v. Carnahan*, 684 F.3d 732, 735 (8th Cir. 2012) (cleaned up).

[35] *See Gonzalez*, 781 F.3d at 431.

[36] *Id.*; *see also United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013).

[37] *Cf. United States v. Daigle*, 947 F.3d 1076, 1084-85 (8th Cir. 2020) (holding that when affidavit failed to include inconsistencies in victim's statements, no *Franks* violation occurred, as victim explained the inconsistencies and thus supplementation would not have prevented a finding of probable cause; and citing case in which the court held "the officer's omission from his affidavit of the victim's allegedly untrue statements did not constitute a *Franks* violation

17

## III. CONCLUSION

I respectfully recommend **DENYING** Diaz's motion to suppress (Doc. 28) and the amended sealed motion for *Franks* review (Doc. 56).

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections.[38] Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[39] Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[40]

**DATED** September 19, 2023.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

because the statements did not necessarily detract from the victim's credibility regarding the crime at issue").

[38] **LCrR 59**.

[39] *See* **Fed. R. Crim. P. 59**.

[40] *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).