# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>EDWIN EDGARDO DIAZ,<br><br>Defendant. | No. CR23-4012-LTS<br><br>**ORDER ON REPORT AND RECOMMENDATION** |

## I.     INTRODUCTION

This case is before me on a Report and Recommendation (R&R) in which the Honorable Kelly K.E. Mahoney, Chief United States Magistrate Judge, recommends that I deny defendant Edwin Diaz's motion (Doc. 28) to suppress and amended motion (Doc. 56) for *Franks* review. *See* Doc. 62. Diaz filed timely objections (Doc. 71), along with a supporting brief (Doc. 76), and the Government filed a response (Doc. 77).

## II.     BACKGROUND

### A.     *Procedural History*

On February 16, 2023, the Grand Jury returned an indictment (Doc. 3) charging Diaz with two counts of possession with intent to distribute a controlled substance and one count of possession of firearm and ammunition by a prohibited person. Diaz filed his motion (Doc. 28) to suppress on June 16, 2023. The Government filed its resistance (Doc. 41) on July 10, 2023, and filed supplements to the resistance on August 1, 2023, and August 3, 2023. Docs. 48, 51.

Judge Mahoney conducted a suppression hearing on August 2, 2023.[1] Doc. 50. The Government presented testimony from Woodbury County Deputy Sheriff Jared Clausen and Sac County Sheriff's Office Detective Kathryn Stange. *Id*. Judge Mahoney also received the following exhibits into evidence:

Exhibit 1: Search warrant documents (Doc. 42);

Exhibit 2: Search warrant return (Doc. 41-2);

Exhibit 3: Report - Stange (Doc. 41-3);

Exhibit 4: Video - Clausen patrol vehicle;

Exhibit 5: Video - Clausen body camera;

Exhibit 6: Report - Clausen (Doc. 41-4); and

Exhibit 7: Sac County court documents (Doc. 48-1).

*See* Doc. 50.

At the conclusion of the suppression hearing, Judge Mahoney granted Diaz's request to supplement his motion to suppress to add a challenge to the search warrant pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Doc. 62 at 2. Diaz filed his amended motion (Doc. 56) for *Franks* review on August 15, 2023, and the Government filed a response (Doc. 59) on August 29, 2023. Judge Mahoney filed the R&R on September 19, 2023, addressing both the initial motion (Doc. 28) to suppress and the request (Doc. 56) for *Franks* review.

### B.    *Relevant Facts*

Section I of the R&R contains detailed findings of fact. Doc. 62 at 2-8. Diaz has raised no objections to those findings. Doc. 71. As such, they are incorporated herein and will be referenced as necessary in my discussion of Diaz's objections.

---

[1] The hearing transcript is available at Doc. 52.

### III. STANDARD OF REVIEW

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

## IV.    DISCUSSION

Diaz objects to the following conclusions in the R&R: (1) Clausen's activation of his police vehicle's red and blue emergency lights did not convert the encounter into a seizure under the Fourth Amendment; (2) Clausen could lawfully stop Diaz's vehicle for suspected violations of Iowa traffic laws; (3) Clausen lawfully approached the vehicle and had probable cause to search the vehicle; (4) the issuing judge could reasonably infer that drug manufacturers often keep contraband and proceeds at their personal residences; and (5) the *Leon* good-faith exception applies.[2]  Doc. 71.

### A.    *Clausen's Activation of the Red and Blue Emergency Lights*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.  Not every encounter between a police officer and a citizen constitutes an unreasonable seizure under the Fourth Amendment: "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons.  Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."  *United States v. Mendenhall,* 446 U.S. 544, 553-54 (1980) ("Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards.  The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'") (quoting *United States v. Martinez-Fuerte,* 428 U.S. 543, 554 (1976)).

---

[2] Diaz does not object to Judge Mahoney's conclusion that no *Franks* violation occurred.  *See* Doc. 62 at 16-17; Doc. 71 at 1-2.  As such, I have reviewed that conclusion under the clearly erroneous standard and agree with Judge Mahoney's determination.

4

The Supreme Court has held "that mere police questioning does not constitute a seizure." *Florida v. Bostick,* 501 U.S. 429, 434 (1991). For example, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Id.* (quoting *Florida v. Royer,* 460 U.S. 491, 497 (1983) (plurality opinion)).

In determining whether an encounter between a police officer and a citizen constitutes a Fourth Amendment detention or seizure, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* at 437 (quoting *Michigan v. Chesternut,* 486 U.S. 567, 569 (1988)). This "'reasonable person' test presupposes an *innocent* person." *Bostick,* 501 U.S. at 438. When conducting the analysis, "[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall,* 446 U.S. at 554. "In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Id.* at 555. Whether a police officer subjectively believes he or she has detained an individual has little or no influence on the Fourth Amendment analysis, as the proper inquiry is to "examine the facts and circumstances at the time from [the defendant]'s perspective as a reasonable person being questioned." *United States v. Garcia,* 197 F.3d 1223, 1226 (8th Cir. 1999).

The parties disagree as to whether Clausen's encounter with Diaz was converted into a seizure that implicates the Fourth Amendment when Clausen parked his police vehicle behind Diaz's parked vehicle and activated the vehicle's red and blue emergency

5

lights. The Eighth Circuit has not directly addressed whether law enforcement's activation of red and blue emergency lights behind a parked vehicle is sufficient, by itself, to constitute a seizure under the Fourth Amendment, but four cases provide a useful framework:

In *United States v. Dockter,* 58 F.3d 1284 (8th Cir. 1995), a police officer approached a vehicle that was parked off the "traveled portion of the road." *Id.* at 1285. He parked directly behind the vehicle and activated the amber lights on his vehicle's light bar. The court held that parking behind the vehicle and activating the vehicle's amber lights did not constitute a seizure.[3] *Id.* at 1286-87. The court reasoned that the officer did not block the passengers' vehicle, he did not draw his weapon and his tone of voice was not coercive. *Id.* at 1287. Further, activation of the amber lights was evidence that the purpose of the stop was roadside assistance rather than to seize the passengers. *Id.*

In *United States v. Barry,* 394 F.3d 1070 (8th Cir. 2005), a police officer parked his marked cruiser about 15 feet in front of a parked vehicle and approached the vehicle with his hand on his gun. *Id.* at 1072. He then shined his flashlight on his police uniform and knocked on the window. *Id.* An occupant rolled down the passenger-side window after the third knock, at which point the officer smelled marijuana and asked the occupants to exit the vehicle. *Id.* The court determined that no seizure had occurred until the police officer asked the occupants to exit the vehicle. The court reasoned that the officer "approaching [the vehicle] and knocking on the window did not amount to a show of authority such that a reasonable person would believe he was not at liberty to ignore [the officer's] presence and go about his business." *Id.* at 1075. Further, and of relevance to this case, the court explained that up until that time, the officer "exhibited no show of

---

[3] Unlike red and blue emergency lights, motorists are not required to yield or stop for amber lights, which are normally used for cautionary purposes. *See* Law Enforcement Vehicle Lighting and Reflectivity Studies: An Overview, JUSTICE TECHNOLOGY INFORMATION CENTER, https://www.ojp.gov/pdffiles1/nij/nlectc/253106.pdf.

authority, that is, he never drew his holstered weapon, he never activated his emergency lights, and he never ordered [the occupants] to exit his vehicle." *Id.*

In *United States v. Carpenter,* 462 F.3d 981 (8th Cir. 2006), an officer pulled behind a vehicle parked on the side of the road and activated his emergency lights.[4] *Id.* at 983. He then asked the driver a series of questions, including the driver's destination and whether the driver was lost. *Id.* The officer then asked for the driver's license and rental papers. *Id.* at 984. Finally, the officer asked the driver to exit his vehicle to be patted down for drugs and weapons. *Id.* The court held that no seizure occurred until the officer requested the driver to exit his vehicle and patted him down. *Id.* at 985. The court did not analyze the effect of the officer's activation of his emergency lights when he first approached the vehicle. However by holding that no seizure occurred until the request to exit and subsequent pat-down, the court did not appear to consider the activation of the emergency lights alone to constitute a seizure.

Finally, in *United States v. Cook,* 842 F.3d 597 (8th Cir. 2016), officers parked behind an idling car and activated the "wig wag" setting on their patrol vehicle's lights. *Id.* at 599. That setting produces a different pattern than the full light bar, which signals to drivers that they must stop. *Id.* at 601. As they approached the vehicle, the driver rolled down his window and the officers smelled marijuana and detained the driver. *Id.* The court held that parking behind the idling car and activating the wig-wag lights did not constitute a seizure. *Id.* at 600. The court reasoned that the car was parked when the officers parked behind it, the car was parked in a high-crime area and the officers did not compel the driver to roll down his window. *Id.* at 600-01. Further, the court distinguished "wig wag" lights from the activation of full emergency lights. In doing so, the court read *Barry* to stand for the proposition that "activation of full 'emergency lights' could be a show of authority sufficient to be a seizure under the Fourth Amendment," but the court had no need to reach that issue. *Id.* at 601.

---

[4] The court did not specify the color of the emergency lights.

7

These cases illustrate two important concepts that are relevant to the issue of whether Diaz was seized under the Fourth Amendment. First, even though the *Cook* court suggested that the activation of full emergency lights could be a show of authority sufficient to be a seizure under the Fourth Amendment, the Eighth Circuit has stopped short of announcing such a categorical rule. Rather, activation of full emergency lights is one factor among many to consider when deciding "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Bostick,* 501 U.S. at 434. Second, in evaluating whether a police interaction has been converted into a seizure, activation of full red and blue emergency lights is a more significant show of authority than the deployment of other settings, such as "wig wag" or amber warning lights.

Cases from other jurisdictions provide additional context. The First Circuit has suggested that activation of red and blue emergency lights behind a parked car should weigh significantly in favor of seizure, even hinting that this action could alone constitute a seizure. *See United States v. Tanguay,* 918 F.3d 1 (1st Cir. 2019) ("The activation of the blue flashing lights atop [the police officer's] cruiser is a different story. This is not the type of conduct in which an ordinary citizen would likely engage. Nor does the weight of precedent routinely classify such conduct as failing to send a message of command. Certainly drivers who view such lights in the rearview mirrors usually construe them as a command to pull over. *See Brower v. County of Inyo,* 489 U.S. 593, 598 (1989)."). The Tenth Circuit has also given significant weight to the activation of emergency lights behind a parked car, especially if the state's traffic laws criminalize failure to pull over for those same emergency lights. *United States v. Gaines,* 918 F.3d 793 (10th Cir. 2019) (weighing police officers' arrival at a parked car with red and blue emergency lights activated in favor of a seizure when Kansas law criminalized failure to stop for a police officer's emergency lights). The *Gaines* court further downplayed the officers' explanation that they had activated their emergency lights because their police

8

cruisers were blocking traffic. *Id.* ("[T]he officers' subjective intent had little bearing on whether a reasonable person would have thought that he or she could leave.").

The Seventh Circuit has held that activating emergency lights does not, by itself, constitute a seizure and has articulated a scenario in which the activation of emergency lights should carry less weight. *United States v. Clements,* 522 F.3d 790, 794-95 (7th Cir. 2008). In *Clements,* the court held that no seizure occurred when the police officers parked 15 to 20 feet behind a parked vehicle late at night and activated the vehicle's emergency blue and red lights, reasoning that activating the lights was necessary for officer safety and that activation of the emergency lights weighed against a seizure. *Id.* ("Other than illuminating their flashing lights for identification and safety purposes, the officers did nothing that could have made Clements feel that his freedom was restrained: they did not draw their weapons, they did not surround Clements' car with multiple squad cars or officers or otherwise prevent him from driving away, they did not lay a hand on Clements, and they did not use forceful language or tone of voice until after the officers felt threatened by Clements' gesture with the knife. Up to this point, the circumstances could not have caused a reasonable person to feel restrained.").

I conclude that a law enforcement officer's activation of red and blue emergency does not, by itself, establish a seizure for Fourth Amendment purposes. However, it is a factor that weighs in favor of finding a seizure. Certain other facts weigh against a finding of seizure. For example, Diaz was sitting in a truck that appeared to be wrecked.[5] Gov. Ex. 5 at 1:28-1:35 (Diaz explaining to Clausen that the truck had been in the impound lot due to a wreck). Reasonable persons sitting in a vehicle in disrepair in the middle of winter could assume that the officer is approaching to check on their welfare.

---

[5] Clausen's body camera footage does not resolve conclusively how Diaz's truck ended up parked in the residential area where the encounter occurred. Diaz claimed that the truck had been towed from the impound lot to that spot earlier that day, while Clausen appeared to believe that Diaz had driven the truck to that spot. What is clear from the video is that the truck was parked haphazardly and it appeared to be in rough enough condition that it was reasonable for Clausen to believe that the truck had broken down.

9

Additionally, as in *Clements,* the encounter occurred at night and the emergency lights were helpful to signal to Diaz that the person approaching was a police officer, not a random stranger. Further, Clausen was alone and parked his police vehicle behind Diaz in a manner that did not prevent Diaz from driving forward. Finally, some of Clausen's initial questions focused on whether Diaz and his passenger, Mikaela Breen, had been in an accident or the truck had broken down. *Id.* at 00:08-00:57. Before mentioning that he smelled marijuana, one of the reasons Clausen gave Diaz for stopping was that it was cold outside and the car appeared to be wrecked. *Id.*

By contrast, in addition to the activation of the red and blue emergency lights, some of Clausen's conduct weighs in favor of finding that a seizure occurred. As Clausen approached Diaz's vehicle, he put his hand on his service weapon. Gov. Ex. 4 at 1:12-1:22. While Clausen only briefly touched the weapon, if Diaz looked out the window as Clausen approached, he would have observed red and blue lights flashing behind him as a uniformed police officer approached with his hand on his service weapon. *See United States v. Ceballos,* 2008 WL 5999636 at *16 (D.N.M. Dec. 24, 2008), *rev'd on other grounds,* 355 F. App'x 226 (10th Cir. 2009) (a police officer approaching a parked vehicle with his hand on his gun was a factor in favor of seizure); *see also United States v. Esparza-Mendoza,* 386 F.3d 953, 959 (10th Cir. 2004) (a uniformed and armed officer is a factor that supports a finding that a seizure occurred). By the time Clausen reached Diaz's truck, his hand was no longer on his gun, but even briefly putting his hand to his service weapon, paired with the activation of the red and blue emergency lights, could lead a reasonable person to believe that he was not "at liberty to ignore [Clausen's] presence and go about his business." *Bostick,* 501 U.S. at 434.[6]

---

[6] The following images of Clausen approaching Diaz's vehicle are screenshots from Government Exhibit 4 and depict the approximately 10-second period from Clausen exiting his vehicle to reaching Diaz's vehicle.







In addition, not all of Clausen's initial questions focused on the well-being of Diaz and Breen. After asking how they were doing, Clausen asked "What are you guys doing?" Gov. Ex. 5 at 00:12-00:15. Shortly after, he asked for Diaz's identification. *Id.* at 00:28-00:30. While he did not ask these questions aggressively, they were more investigatory in nature than simply asking about Diaz and Breen's welfare. *See Ceballos,* 2008 WL 5999636 at *16 (asking defendant for identification weighed in favor of a seizure). Finally, when Diaz asked Clausen why Clausen had stopped, two of his three answers focused on possible wrong-doing. Gov. Ex. 5 at 00:43-00:58. (Clausen explaining that he stopped because Diaz was parked in front of a residence, that he stopped to see if they were okay and that he could now smell marijuana).

After evaluating all the relevant circumstances, I find that a seizure occurred when Clausen parked behind Diaz, activated his red and blue emergency lights and approached the vehicle with his hand on his service weapon. As noted above, Diaz would have seen a uniformed and armed police officer activate the red and blue light bar, then approach

12

the vehicle while placing his hand on his weapon. While Clausen focused some of his questioning on Diaz's welfare, much of the interaction focused on inquiring into Diaz and Breen's conduct, such as what they were doing parked in front of a residence. Despite the late hour and the ramshackle condition of Diaz's car, this is not the type of scenario that would leave a reasonable person with the feeling that he or she was "at liberty to ignore [Clausen's] presence and go about his business." *Bostick,* 501 U.S. at 434. Because I agree with Diaz that a seizure occurred, Diaz's objection to this finding in the R&R is **sustained**.

### B.      *Clausen's Stop of Diaz for Suspected Violations of Iowa Traffic Laws*

Even if a seizure occurred when Clausen activated his red and blue emergency lights and approached Diaz's vehicle, this seizure would be permissible if Clausen had probable cause to conduct a traffic stop. *United States v. Wright,* 512 F.3d 466, 471 (8th Cir. 2008). Diaz objects to Judge Mahoney's finding that "Clausen could lawfully stop the vehicle for potential traffic violations." Doc. 62 at 10. Diaz argues that even though several lights on his truck were inoperable, "Clausen did not observe the pickup truck being driven, violating Iowa law." Doc. 76 at 5. Further, Diaz argues that his vehicle was not violating any parking laws at the time Clausen approached him. *Id.* In Section II of the R&R, Judge Mahoney wrote the following:

> In addition, Deputy Clausen could lawfully stop the vehicle for potential traffic violations. 'Any traffic violation, however minor, provides probable cause for a traffic stop.' Deputy Clausen testified that the pickup was parked 'cockeyed,' blocking the north-south flow of traffic, and that it had only one working head lamp. According to Deputy Clausen, these constituted violations of Iowa's traffic laws. The video shows that the back end of the pickup stuck out farther from the curb than the front of the pickup. Though it did not prevent another vehicle from passing, the pickup was parked across a good part of the right lane and would likely have prevented two vehicles traveling toward each other on that road from driving by at the same time. The pickup's curbside wheels do not appear to be parallel to and within eighteen inches of the curb, as required by law. In addition, the video shows that when Deputy Clausen first drove by the

pickup, the head lamp illuminated on the passenger's side but not on the driver's side. Though the vehicle was not actively being driven at the time, it seems reasonable that it had been or was going to be driven, providing a basis for Deputy Clausen to investigate a potential violation of the head lamp statute. This provided an additional ground for Deputy Clausen to investigate.

Doc. 62 at 10-11.

Based on my de novo review, I agree. As Judge Mahoney noted, "Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Hollins,* 685 F.3d 703, 706 (8th Cir. 2012). Diaz's broken headlights violated Iowa Code §§ 321.384 and 321.385, providing Clausen with probable cause to conduct a traffic stop. While Diaz argues that he was not driving, it was plausible for Clausen to suspect that Diaz had recently driven the truck or was about to do so. I further agree, after reviewing the dashboard camera video, that Diaz's truck's wheels did not appear to be parallel to and within eighteen inches of the curb, thus violating Iowa Code § 321.361(1) and providing further justification for a stop.

For these reasons, even though a seizure occurred when Clausen activated his red and blue emergency lights and approached the truck, the seizure was lawful because Clausen had probable cause to conduct a traffic stop. Diaz's objection as to this finding in the R&R is **overruled**.


**C.     *Clausen's search of Diaz's vehicle***

Diaz next objects to Judge Mahoney's finding that Clausen lawfully approached his vehicle and had probable cause to search the vehicle. As discussed above, Clausen had probable cause to stop Diaz and approach his vehicle. As to the vehicle search, I agree with Judge Mahoney's finding that the odor of marijuana was sufficient to search the vehicle under the automobile exception to the warrant requirement. *United States v. Williams,* 955 F.3d 734, 737 (8th Cir. 2020). I also agree that Clausen's observation of Diaz's suspicious behavior in discarding a baggie from his pocket provided further

14

probable cause to search the vehicle. Diaz's objection as to this finding in the R&R is **overruled**.

### D. *The Issuance of the Search Warrant for Diaz's Residence*

Diaz objects to Judge Mahoney's findings (1) that the issuing judge could reasonably infer that drug traffickers often keep contraband and proceeds at their personal residences and (2) that, in any event, the good-faith exception applies. Doc. 71 at 2. Diaz argues that the information on which the search warrant relied was stale and unreliable, and there was no nexus between the facts alleged in the search warrant affidavit and the place to be searched. *Id.* at 5. Thus, Diaz requests that the evidence obtained from the search of his residence be suppressed.

Regarding staleness, Diaz relies on *United States v. Button,* 653 F.2d 319 (8th Cir. 1981). In *Button,* a search warrant relied on information that the police officer affiant had received "over the past six months" and the only specific date contained in the warrant was the date on which the search was to be executed. *Id.* at 324. The court held that the information in the affidavit was stale and that probable cause was not established at the time the warrant was issued. *Id.* at 325. The court reasoned that the lack of specificity with regard to the time frame in the search warrant meant that the information could have become stale by the time the warrant was issued. *Id.* The court further noted that because drugs can easily be moved, information that a drug was in a building on one date does not establish probable cause that the drugs would be in the same building at a later date. *Id.*

The facts here are significantly different from those in *Button*. The warrant application in this case contained detailed allegations covering a five-day period, not general allegations over a six-month period. For example, the warrant described Diaz's alleged false imprisonment of Mikaela Breen that directly related to his arrest for distribution quantities of methamphetamine just four days prior. The information contained in the affidavit was not stale.

15

Diaz also relies on *Button* to argue that the witness who supplied much of the information contained in the affidavit, Mikaela Breen, was unreliable. In *Button,* the court held that the information in the affidavit was unreliable because it was based on uncorroborated statements from a sole confidential informant. *Id.* at 326-27. While the affidavit in this case also relies on information from a single witness, the similarities end there. As Judge Mahoney noted:

> [L]aw enforcement corroborated aspects of Breen's story: the gas station clerk confirmed Breen had been dropped off in a red Chevrolet Cruz; registration records tied the red Chevrolet Cruz to Diaz's girlfriend, who Breen said had been driving; social media showed Diaz and his girlfriend's relationship status; the Sac County Sheriff's office knew that a named individual had previously lived at an apartment complex as described by Breen, and the person Breen said Diaz confronted her about was in fact detained in the Ida County Jail as Breen indicated.

Doc. 62 at 12-13 (internal citations omitted). She further noted, correctly, that "even the corroboration of minor, innocent details can suffice to establish probable cause." *United States v. O'Dell,* 766 F.3d 870, 874 (8th Cir. 2014). I find that the affidavit was based on reliable information.

Finally, Diaz argues that there was not a sufficient nexus between his vehicle and his residence. Judge Mahoney observed that "it is questionable whether the affidavit sets out facts establishing probable cause to search Diaz's house for evidence of drug trafficking." Doc. 62 at 13. In the Eighth Circuit, "without a nexus between a defendant's drug-dealing and the defendant's residence, evidence of the former does not provide probable cause for a warrant to search the latter." *United States v. Norey,* 31 F.4th 631, 637 (8th Cir. 2022).

Cases that have found such a nexus are distinguishable. For example, in *United States v. Luloff,* 15 F.3d 763 (8th Cir. 1994), the court found a sufficient nexus when the affidavit showed that the defendant had engaged in continuous drug dealing over the course of several years and the case agent included a belief statement in the affidavit that drug traffickers often keep evidence of their drug dealing in their residences. *Id.* at 768.

16

Here, the affidavit includes only one instance of drug dealing from five days before the affidavit and evidence of previous drug use. Doc. 42 at 10. While the affidavit includes Stange's statement that "individuals who have possession of illegally possessed controlled substances will typically keep paraphernalia and accessories including pipes, baggies, and scales," it does not include any indication of Stange's belief that such items would be found at Diaz's residence. *Id.*

In *United States v. Keele,* 589 F.3d 940 (8th Cir. 2009), the search warrant affidavit included evidence that the defendant was involved in the manufacture and distribution of crack cocaine, as well as a statement from the case agent that "drug manufacturers often keep contraband and proceeds at their personal residences." *Id.* at 944. In *Keele,* the single instance of drug dealing that led to the agent's statement included the discovery of materials used for the manufacture of narcotics, not just their distribution. *Id.* at 943-44 (explaining how officers discovered items in the defendant's car that are often used to convert cocaine hydrochloride into cocaine base). Here, Clausen found distribution quantities of methamphetamine in Diaz's truck but did not discover any materials that would lead to an inference that any manufacturing or distribution was occurring at Diaz's residence. Moreover, unlike *Keele,* the affidavit did not include a belief statement linking the methamphetamine from Diaz's truck to Diaz's home.

Based on my de novo review, I find that the search warrant affidavit did not demonstrate probable cause to search Diaz's residence, as there was not a sufficient nexus between the facts alleged in the affidavit and the residence. Diaz's objection as to this finding in the R&R is **sustained**.

This does not end the inquiry, as "the exclusionary rule should not be applied to bar the admission of 'evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate,' even if that search warrant is later determined to be invalid." *United States v. Ralston*, 88 F.4th 776 (8th Cir. 2023),

slip op. at 4 (quoting *United States v. Leon*, 468 U.S. 897, 900, 922-23 (1984)).[7]  In *Ralston*, the Eighth Circuit identified four circumstances under which "[a]n officer's reliance on a search warrant is objectively unreasonable:

> (1) when the affidavit or testimony in support of the warrant included a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the judge 'wholly abandoned his judicial role' in issuing the warrant; (3) when the affidavit in support of the warrant was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; and (4) when the warrant is 'so facially deficient' that the executing officer could not reasonably presume the warrant to be valid.

*Ralston*, slip op. at 4 (citing *United States v. Grant*, 490 F.3d 627, 632-33 (8th Cir. 2007)) (quoting, in turn, *Leon*, 468 U.S. at 923).  The *Ralston* court found the good-faith exception to be inapplicable based on the third circumstance – a complete lack of indica of probable cause.  *Id*. at 8.  In that case, Colton Varty was being investigated for a series of burglaries.  *Id*. at 2.  He resided in, or at least was "frequenting," a mobile home located on a nine-acre parcel of land that also included a single-family home that was occupied by Ralston.  *Id*.  Officers obtained a search warrant that authorized a search of not only the mobile home associated with Varty, but also Ralston's residence and various outbuildings.  *Id*.  Based on evidence discovered during the search of Ralston's residence, Ralston was charged with being a prohibited person in possession of a firearm.  *Id*.

Ralston moved to suppress on grounds that the search warrant affidavit failed to establish probable cause to search his residence.  The trial court agreed but applied *Leon*'s good-faith exception to deny the suppression motion.  *Id*. at 3-4.  The Eighth Circuit reversed, concluding as follows:

> Armed with only the proximity of residences on rural property, conclusory assertions that lacked a nexus to Ralston's residence or the targeted offenses, and no evidence of a relationship between Ralston and Varty or

---

[7] *Ralston*, Eighth Circuit No. 22-3352, was decided on December 14, 2023, and citations to specific pages of Federal Reporter are not yet available.

evidence that Varty had access to Ralston's house, a reasonable officer would not believe there was a sufficient nexus to establish probable cause to search Ralston's residence for evidence related to the burglaries or fencing stolen property. While the affidavit was detailed, focused, and probative as to Varty's criminal activity, it said little about Ralston and lacked any specifics connecting Ralston or his residence to the offenses under investigation. Given the paucity of evidence as to Ralston, law enforcement should have been aware of the affidavit's deficiencies. The additional information not included in the affidavit that consists of conclusory assertions and details unrelated to the offenses under investigation does not cure the deficiencies.

*Id*. at 8. *Ralston* thus provides cautionary guidance as to the limits of the good-faith exception to the exclusionary rule. By focusing on Varty's criminal activities, and failing to provide information linking Ralston and his residence to those activities, the warrant application was so lacking in any indicia of probable cause that law enforcement's reliance on the warrant was objectively unreasonable.

This case is significantly different. The warrant application addressed Diaz's own conduct, not just the actions of a third party. Among other things, the supporting affidavit noted that Diaz had been arrested in Ida County on December 31, 2022, and charged with possession of a controlled substance after being found with 50 grams of methamphetamine – a distribution quantity. Doc. 42 at 10. The affidavit also outlined Diaz's criminal history, which includes multiple convictions for controlled substance offenses. *Id*. at 9-10. It further described Breen's allegation that Diaz made threats to force her to take responsibility for the drugs Diaz had been charged with possessing. *Id*. at 8-9. Based on the information in the affidavit, probable cause existed to believe that Diaz had been involved in recent drug trafficking.

The Eighth Circuit has stated:

[W]e have applied the good-faith exception in controlled-substance cases even when an affidavit did not establish a nexus between the search location and the suspected contraband. In those cases, we concluded that the facts enabled an officer and the issuing judge to logically infer that a drug dealer would store contraband at his residence. *See* [*United States v. Carpenter*,

19

341 F.3d 666, 669, 671-72 (8th Cir. 2003)] (stating it was not "entirely unreasonable" for an officer to rely on the warrant because, "[a]s a matter of common sense, it is logical to infer that someone in possession of valuable contraband would store that contraband in a safe, accessible location such as his or her residence"); *see also* [*United States v. Moya*, 690 F.3d 944, 948-49 (8th Cir. 2012)] (holding that the good-faith exception applied because it was not unreasonable for the issuing judge to infer evidence would be at a suspect's house when the affidavit indicated the suspect was distributing methamphetamine in the area, making the officer's reliance objectively reasonable).

*United States v. Mayweather*, 993 F.3d 1035, 1041 (8th Cir. 2021). Unlike the situation in *Ralston*, in this case reliance on the search warrant was not unreasonable in light of information indicating that Diaz had recently been in possession of a distribution quantity of methamphetamine.[8] As such, suppression of evidence discovered during the search of the residence is not appropriate. Because the *Leon* good-faith exception applies, Diaz's objection as to this finding in the R&R is **overruled**.

## V. CONCLUSION

For the reasons set forth herein:

1. Diaz's objections (Doc. 71) to the Report and Recommendation (Doc. 62) are **sustained in part** and **overruled in part**, as set forth in this order.

2. The Report and Recommendation (Doc. 62) is hereby **accepted**, as modified herein.

3. Diaz's motion (Doc. 28) to suppress and amended motion (Doc. 56) for *Franks* review are **denied**.

---

[8] As Judge Mahoney noted, Stange was aware of other information, not included in the search warrant application, indicating that Diaz had been involved in drug trafficking activities. Doc. 62 at 15-16. This information is relevant to the issue of whether law enforcement's reliance on the search warrant was objectively reasonable. *See, e.g., United States v. Dickerman*, 954 F.3d 1060, 1067 (8th Cir. 2020).

**IT IS SO ORDERED.**

**DATED** this 5th day of January, 2024.

_____
Leonard T. Strand, Chief Judge